**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-41553

_____


EUGENE KERR and GENEVA KERR,

                              Plaintiffs-Appellants,

VERSUS

ROLAND SCOTT LYFORD; ET AL,

                              Defendants,

ROLAND SCOTT LYFORD, ANN GOAR, DEBBIE MINSHEW,
        BROOKS FLEIG, and STEVE BAGGS,

                              Defendants-Appellees.


_____

Appeal from the United States District Court
for the Eastern District of Texas
_____
April 14, 1999

Before JONES, SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


    Plaintiffs appeal the dismissal, on grounds of immunity, of
their civil rights claim.  We affirm.

I.

A.

    Eugene and Geneva Kerr (the "Kerrs") allege that they were
wrongfully  investigated,  arrested,  and  incarcerated  for  the

kidnaping, rape, and murder of Kelly Wilson. They sued, under 42 U.S.C. § 1983, those persons involved in the investigation and prosecution that led to their arrest and incarceration: Roland Lyford, Ann Goar, Debbie Minshew, Brooks Fleig, and Steve Baggs. Moving for summary judgment, Goar, Minshew, Fleig, and Baggs claimed qualified immunity; Lyford asserted absolute and qualified immunity.

B.

Defendants' involvement in this disturbing and largely unresolved saga of child abuse, child molestation, and occult-related rape and murder can be traced to November 1990, when Goar, an employee of the Texas Department of Human Services ("TDHS"),[1] was assigned the case of Loretta and Wendell Kerr and their four children. Wendell Kerr is the son of plaintiffs Eugene and Geneva Kerr, so his and Loretta's children are the grandchildren of the instant plaintiffs. On account of sexual abuse allegations made against Wendell Kerr, the Kerrs' grandchildren (the "Kerr children") were living in foster homes, and it was Goar's responsibility to meet with them on a monthly basis.

In December 1990, Goar was shown a letter addressed to Wendell Kerr written by Lucas Geer, the brother of Wanda Geer Hicks, a

---

[1] The Texas Department of Protective and Regulatory Services ("TDPRS") eventually assumed TDHS's child protective services responsibilities. We use "TDHS" to refer to both TDHS and its successor, TDPRS.

woman who, following her divorce from James Hicks, had begun dating Wendell Kerr (who had recently divorced Loretta Kerr).  In this letter, Lucas Geer appears to apologize to Wendell Kerr for sexually abusing one of Wanda Geer Hicks's sons.  As a result of this letter, Goar began to counsel Wanda Geer Hicks and her five children (hereinafter referred to collectively as the "Hicks children") in addition to the Kerr children mentioned above.

In May 1991, Wendell Kerr was indicted on charges that he had sexually abused one of his daughters.  When TDHS discovered that Wendell Kerr had married Wanda Geer Hicks (hereinafter referred to as "Wanda Kerr") and moved in with her and her five children, it executed an emergency removal of these children, placing them into three different foster homes.  The most troubled of these children was placed in Barbara Bass's therapeutic foster home.  Minshew was the TDHS caseworker assigned to supervise the Bass home.

Once in their foster homes, the Kerr and Hicks children began to tell elaborate tales of sexual abuse.  They spoke of sexual molestation and sodomization at the hands of their parents, grandparents (Eugene and Geneva Kerr), and strangers.  They reported being coerced into having sex with each other as their parents, grandparents, and strangers looked on and videotaped them. They told of blood, the devil, masks, and knives, all in connection with their sexual abuse.  Lastly, they told graphically of the murder and dismemberment of babies and children at the hands of their parents and grandparents.

The Kerr and Hicks children made the above statements on numerous occasions and in a variety of settings.[2] Some of these statements were proffered spontaneously and voluntarily, while others were elicited via vigorous and coercive questioning, utilizing techniques that have been resoundingly criticized by the plaintiffs' expert and by Child Protective Services ("CPS").[3] Indeed, one of the reasons why the state ultimately dropped its prosecution of the Kerrs on child abuse charges is that, in its opinion, Minshew's and Goar's mishandling of the child witnesses made the children's testimony untrustworthy. The Kerrs' expert witness, Dr. Perry, explained how child witnesses are quite impressionable, and inappropriate forms of questioning can taint even their very recollection of events. Medical examination of the children did reveal, however, genital and anal scarring consistent with their allegations of sexual molestation, and defense experts disputed the charge that Goar's and Minshew's interviewing techniques were improper.

Around June 1992, Goar's and Minshew's supervisor, Loye Bardwell, asked Baggs to help in investigating the Kerrs. Baggs was an investigator for the Criminal Law Enforcement Division of

_____

[2] A large number of these statements were made / elicited during videotaped interviews, which have enabled the plaintiffs' and defendants' dueling experts to critique the style of questioning employed by the defendants. *See infra*.

[3] Perry and CPS were particularly critical of Goar and Minshew for obtaining information from the children via the "holding" technique, whereby a child would be held against his will until he provided answers to questions. As best we can tell from the record, this technique was applied by the foster parents to get the children to repeat, for Goar and Minshew, statements made regarding sexual abuse.

the Texas Department of Public Safety who had developed expertise in investigating ritualistic behavior and occult practices. He assented and called on Fleig, a Louisiana peace officer, also experienced in ritually-based crime, to assist him. Baggs's and Fleig's discussions with the children convinced them of the possibility that the Kerrs had engaged in some sort of ritualistic abuse.

One of the adults identified by the children as a participant in their victimization was Lucas Geer, who was currently serving time for violating the conditions of his parole. Baggs and Fleig interviewed Geer and heard him confess to making a variety of sexual assaults on the children and to participating in the ritualistic murder of babies on the Kerrs' property. Geer corroborated many of the allegations made by the Kerr and Hicks children implicating the other Kerr adults, including Eugene and Geneva Kerr, in their abuse and torture. Polygraph testing suggested that Geer was truthful in making these statements.

Statements of the Kerr and Hicks children also led defendants to "R.S.," a male juvenile who was another alleged victim of sexual molestation at the hands of the Kerr adults. R.S. provided the initial link between the child abuse investigation of the Kerrs and the Kelly Wilson murder: He told investigators that he had witnessed Wilson's abduction, rape, and murder.[4] He provided details

---

[4] On an earlier occasion Geer had told Minshew that Geneva Kerr had killed
(continued...)

5

of these events and said that Wilson's body was kept in a shed in the Kerrs' backyard.

Utilizing an infrared system designed to detect heat rays emitted from human remains buried underground, Baggs flew over the Kerrs' property and located two potential sites of such remains. A cadaver-sensing dog also alerted to three potential sites: (1) a toolbox containing a blue bag, (2) a red shed, and (3) three shallow grave-like depressions in the soil. The red shed exhibited signs of recent heavy washing and repainting and contained a shovel that had blood residue on it. Additionally, investigation revealed a circular clearing in the woods behind the Kerrs' house that matched the description given by the children as the place where much of their sexual abuse had occurred.

In May 1993, Upshur County District Attorney Tim Cone obtained indictments against the Kerrs§§along with four other members of the Kerr family§§alleging sexual child abuse. Discovering that he was disqualified from prosecuting the indictments because of prior representation of the Kerr family, Cone asked the state district court in Upshur County to appoint Lyford as special prosecutor pursuant to TEX. CODE CRIM. PROC. ANN. ART. 2.07 (Vernon 1977). Cone also personally appointed Lyford as an assistant district attorney ("ADA") *pro tem* for Upshur County,

---

[4](...continued)
Wilson, but Minshew thought Geer was just being dramatic and did not follow up on this statement; theretofore there had been nothing connecting the Kerrs to Wilson.

6

charged with prosecuting the sexual abuse cases and "any criminal or civil lawsuits arising out of any and all incidents related or connected" thereto.

Lyford had served two years as the Travis County District Attorney's Office Chief Litigator for TDHS. At the time he was appointed special prosecutor in the instant case, he was practicing law with a prominent firm in Galveston, Texas.

In December 1993, Lyford reached plea agreements with Wanda Kerr and Connie Martin, who, pursuant to their agreements, provided, among other things, further evidence implicating the Kerrs in Wilson's kidnaping, sexual assault, and murder. They identified items removed from the blue bag found in a toolbox on the Kerrs' property as instrumentalities of restraint and torture.[5] Wanda Kerr and Connie Martin passed polygraph tests in connection with their statements.

Wanda Kerr also described how Danny Kerr (son of Eugene and Geneva Kerr) had abducted Wilson as an apparent "birthday present" for Geneva Kerr. Danny Kerr purportedly had picked Wilson up in his van and took her to the Kerrs' property, where she was raped and murdered. Her body was kept in the red shed in their backyard. Wanda Kerr even retraced the route Danny Kerr had taken during the

---

[5] These items included a shell necklace, an electrical wire with yellow insulation, a nylon strap tow rope with metal connectors, six rubber tie downs, and brown macrame rope. Human hairs were found on some of these items. Connie Martin and the children explained that the necklace was worn during episodes of sexual abuse, that the electrical wire was attached to a battery and used to shock the mouths and genitals of the children being abused, and that the robe and tie downs were used to restrain the victims of abuse, including Wilson.

abduction.[6]

Connie Martin provided further corroboration of the account of Wilson's abduction given by Wanda Kerr and R.S. She also reiterated the children's stories of ritualistic sex, torture, and murder and stated that some of the victims were buried in Danny Kerr's backyard, in body bags of metal and plastic. A subsequent search of Danny Kerr's backyard, conducted by Baggs and Fleig, revealed bone fragments wrapped in pieces of metal and plastic. These fragments initially were identified by forensic analysis to be subadult human.[7] Baggs and Fleig also uncovered two devil masks, two knives, a bayonet, a blood-stained mattress cover, and a long machete belonging to Danny Kerr. Connie Martin stated that the machete was used by Danny Kerr to dismember his victims, and several of the children included masks and knives in their descriptions of torture and abuse. One of the masksSSthat of a devilSSprecisely fit the description given by the children as one worn during their sexual abuse.

Wendell Kerr, a key figure in R.S.'s, Wanda Kerr's, and Connie Martin's accounts of the Wilson murder, provided an alibi that appeared legitimate. Wendell Kerr worked for a trucking company and had bills of lading and other receipts that appeared to show

---

[6] A subsequent attempt to get R.S. to retrace this route was a failure, as the child appeared extremely anxious and began to offer a version of the abduction that differed "wildly" from his and Wanda Kerr's previous versions.

[7] Upon additional examination, it was concluded that the bone fragments were probably animal, not human.

that he was not in Texas at the time of the events in question. Lyford surmised that someone had substituted for Wendell Kerr and had gathered the aforementioned documentation to enable Wendell Kerr to establish an alibi.

Additional statements were obtained from three adult witnesses not personally involved in the alleged child abuse. Two of these witnesses were adult children of the Kerrs. They revealed to Lyford that they too had been sexually abused by Gene and Geneva Kerr while growing up. Their accounts of sexual abuse in many ways mirrored those of the Kerr grandchildren, and they signed statements to that effect.[8] A third adultSSa neighbor of Martin's SStold defendants that Martin had revealed to her that Danny Kerr, her husband, was sexually abusing their children. On several occasions, one of Martin's sons gave the neighbor detailed accounts of the revealed sexual abuse.

In January 1994, the Kerrs were indicted for the kidnaping, rape, and murder of Kelly Wilson; later they were arrested and imprisoned. The lurid details surrounding these charges led to much media attention, and the Kerrs were widely portrayed as Satan-worshiping murderers.

In March 1994, the Texas Attorney General's office took over the prosecution of the Kerrs. By 1995, all the charges against

---

[8] That is, they too alleged that they were sodomized by their parents and were forced to have sexual relations with their brothers and sisters in front of their parents. They did not, however, witness the Kerrs commit murder.

9

them had been dropped, and the Attorney General declared that the investigators' botched handling of this matter made it impossible to proceed with the prosecution.

## II.

The sole issue is whether the defendants are immune from suit, by virtue of either qualified or absolute immunity. We review *de novo* the summary judgment determination of immunity. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996). In so doing, we follow FED. R. CIV. P. 56(c) in the same manner as did the district court. *Id.*

Rule 56(c) provides for the granting of summary judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). Therefore, we affirm unless the Kerrs can demonstrate either a genuine issue of material fact, or legal error. *See Taylor v. Gregg,* 36 F.3d 453, 455 (5th Cir. 1994). In our search for a genuine, material factual dispute, we review the evidence and all reasonable inferences therefrom in the light most favorable to the Kerrs. *See id.*

## III.

10

Prosecutors enjoy absolute immunity for those activities "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). For this reason, the district court held that Lyford was absolutely immune for his efforts in initiating criminal prosecution against the Kerrs for Wilson's kidnaping, sexual assault, and murder.

The Kerrs challenge Lyford's claim to absolute immunity, asserting that he did not have authority to act as a prosecutor in Texas with regard to the aforementioned crimes. The Kerrs note that Lyford was appointed an "attorney *pro tem*" for the limited purpose of "prosecuting any criminal or civil lawsuits . . . related to or connected with certain indictments returned by the Grand Jury of Upshur County on May 24, 1993 [regarding child abuse]." *See* TEX. CODE CRIM. PROC. ANN. art. 2.07 (Vernon 1977) (authorizing appointment). Because the prosecution of the Kerrs for the kidnaping, sexual assault, and murder of Wilson was unrelated to the child abuse indictments returned against the Kerrs on May 24, 1993, the Kerrs maintain that this prosecution was outside of Lyford's authority. They provide us with examples of prosecutors who acted outside their authority.[9]

Lyford claims prosecutorial immunity for all actions except those performed in "a clear absence of all jurisdiction." *Stump v.*

_____

[9] I.e., *Peña v. Mattox*, 84 F.3d 894, 896 (7th Cir. 1996); *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996), *cert. denied*, 520 U.S. 1115 (1997); *Kulwicki v. Dawson*, 969 F.2d 1454, 1467 (3d Cir. 1992); *Jennings v. Shuman*, 567 F.2d 1213, 1222 (3d Cir. 1977); *Bauers v. Heisel*, 361 F.2d 581, 590-91 (3d Cir. 1966).

*Sparkman*, 435 U.S. 349, 357 (1978).  He contends that, behind the shield of absolute immunity, there is even room for "good faith" mistakes.  *See McCarthy v. Mayo*, 827 F.2d 1310, 1314-15 (9th Cir. 1987).  He rightly distinguishes the cases cited by the Kerrs as largely involving actions in no way similar to those of the present matter.  Lastly, he observes that the Kerrs seemingly have overlooked his second ground of prosecutorial authority: appointment as ADA pursuant to TEX. LOC. GOV. CODE ANN. § 41.102 (Vernon 1988).  Lyford argues that this second appointment can only be read as an expansion of his initial authority as special prosecutor as per § 2.07.

We need not consider the effect of the subsequent appointment, because under the applicable standard, Lyford was entitled to prosecutorial immunity.  A prosecutor's absolute immunity will not be stripped because of action that "was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'"  *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) (citations omitted).[10]

The multiple links between the initial child abuse investigation and the Wilson murder belie the notion that there was a "clear absence of all jurisdiction" to pursue the latter in light

---

[10] Although *Stump* addressed judicial immunity, "immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges . . . ."  *Butz v. Economou*, 438 U.S. 478, 510 (1978).

12

of explicit authorization to pursue the former.  Those links are as follows:

> 1.  The child abuse investigation led investigators to Geer as someone who was both a participant and a  witness in said abuse;
>
> 2.  Geer disclosed information regarding the ritualistic murder of children, including Wilson, in the presence of, and on the property of, the Kerrs;
>
> 3.  at least one of the victimized children described the Kerrs' involvement in Wilson's abduction, rape, torture, and murder; and
>
> 4.  two of the Kerrs' co-defendants, Wanda Kerr and Connie Martin, implicated the Kerrs in the crimes against Wilson.

The spate of cases cited by the Kerrs do not demonstrate that Lyford crossed the limits of his authority, for they all concern the impropriety of a prosecutor's actions *per se*;[11] the instant matter, by contrast, concerns otherwise appropriate actions

---

[11] *Peña v. Mattox*, 84 F.3d 894 (7th Cir. 1996), concerned a prosecutor whose questionable actions were not even prosecutorial in nature. *See Peña*, 84 F.3d at 896.  While Lyford's actions may have been beyond the scope of his prosecutorial authority, they were plainly prosecutorial in nature.  Similarly, in *Doe v. Phillips*, 81 F.3d 1204 (2d Cir. 1996), an ADA required the plaintiff to swear her innocence on a Bible in church as a condition of dropping felony rape charges against her.  *See Doe*, 81 F.3d at 1209.  This case is distinguishable in that the ADA's actions would have been beyond the scope of his authority, regardless of the matters he was charged with prosecuting. *Kulwicki v. Dawson*, 969 F.2d 1454 (3d Cir. 1992), concerned a prosecutor who allegedly fabricated evidence months after he had been recused from the case.  *See Kulwicki*, 969 F.2d at 1467.

Lastly, the Kerrs note that *Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977), concerned a person who, like Lyford, was appointed as special prosecutor in a murder case.  But the similarity ends there, for in *Jennings*, the special prosecutor used his appointment as leverage in an extortion scheme by prosecuting the coroner for solicitation to commit bribery.  *See Jennings*, 567 F.2d at 1222.  That bribery prosecution was held to be outside the prosecutor's authority, because his statutorily-derived authority extended only to "preparation and trial of any indictment for *homicide* or *murder* on behalf of the commonwealth." *See id.* (emphasis added).

rendered inappropriate because they allegedly exceeded Lyford's jurisdictional charge.

The only appellate decision the Kerrs cite that is even remotely on point is *Bauers v. Heisel*, 361 F.2d 581 (3d Cir. 1966), which simply states the rule that "[t]he immunity of a prosecutor . . . is not without limitation . . . . [It] does not extend to acts which are clearly outside their jurisdiction." *Bauers*, 361 F.2d at 591. This merely reiterates the "clearly absent" standard set forth in *Stump*, 435 U.S. at 356-57.

Moreover, the facts of *Bauers* affirmatively hurt the Kerrs' case, as they demonstrate how difficult it is to find that a prosecutor has acted "clearly outside" of his authority. In *Bauers*, a prosecutor was sued in connection with his prosecution of an individual who was under the age of eighteen when he committed his offense. *Bauers,* 361 F.2d at 591. By statute, the prosecutor did not have authority to prosecute such persons. *Id.* The court held:

> The mere fact that the New Jersey Legislature had excised from his responsibility the prosecution of individuals who were under the age of eighteen when they committed acts which would otherwise be punishable offenses does not indicate that [the prosecutor] was acting clearly outside his jurisdiction. On the contrary, it would be difficult to envision a case which was as close to his jurisdiction, but, yet, in excess of it.

*Id.* Because Lyford's prosecution of the Wilson murder was not done "in the clear absence of all jurisdiction," the district court

14

properly afforded him prosecutorial immunity for his prosecutorial activities.

## IV.

Each of the defendants, including Lyford, asserts qualified immunity, the standard for which was explained in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1981): "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Thus, to proceed against a defendant claiming qualified immunity, a plaintiff must demonstrate the existence and violation of a clearly established constitutional right; the defendant may then show that he was performing a discretionary function and that his actions would not have been deemed unconstitutional by a reasonable official in his position at the time of the event. *Id.*

### A.

Absolute, prosecutorial immunity extends only to those activities "intimately associated with the *judicial* phase of the criminal process." *Burns v. Reed*, 500 U.S. 478, 492 (1991) (emphasis added). Therefore, Lyford does not enjoy absolute immunity for his investigatory activities, but only qualified immunity, if any. *See Harlow*, 457 U.S. at 818.

15

The Kerrs identify the following of Lyford's activities as investigatory actions beyond the purview of absolute, prosecutorial immunity:

> 1.   the arrest and imprisonment of the Kerrs through Lyford's unauthorized procurement of indictments for sexual assault, kidnaping and murder;
>
> 2.   the presentment of false, coerced and fabricated testimony to the grand jury;
>
> 3.   the seizure and destruction of the Kerrs' property; and
>
> 4.  the disclosure to the media of bizarre theories of the Kerrs' satanic cult.

The first two of these implicate absolute prosecutorial immunity, not qualified immunity; they are "advocatory" and "central to the prosecutor's task of initiating a prosecution." *Moore v. Valder*, 65 F.3d 189, 194 (D.C. Cir. 1995) (citing *Imbler v. Pachtman,* 424 U.S. 409, 431 (1976)). Thus, Lyford enjoys absolute protection for these activities. The third of these allegations was not presented to the district court as a federal claim and therefore cannot be raised for the first time as such on appeal. *See Stults v. Conoco, Inc.*, 76 F.3d 651, 657 (5th Cir. 1996).

The fourth allegation makes out a claim for defamation, which is not a constitutional tort. *See Paul v. Davis*, 424 U.S. 693, 712 (1976). Because the threshold immunity question is whether the Kerrs have alleged a clear constitutional harm, *see Harlow*, 457 U.S. at 818, failure to do so results in dismissal of the

16

claim.  In sum, none of the Kerrs' claims against Lyford may proceed.

B.

As we have said, Goar and Minshew were TDHS case workers involved in the initial investigation of the Kerr children.  As the Lyford team expanded its probe of the Kerrs to Wilson's disappearance, Goar and Minshew continued to assist in evidence gathering, via the interviewing of child and adult witnesses.  The Kerrs complain that Goar and Minshew violated their civil rights by engaging in malicious prosecution, civil conspiracy, false arrest, seizure, and imprisonment.  The Kerrs levy these same charges against Baggs and Fleig, criminal investigators employed by the TDHS because of their experience in investigating occult-related crimes.  Baggs's and Fleig's responsibilities entailed primarily searching the Kerr properties and interviewing the adult witnesses.

As a threshold matter, we must determine whether (1) the Kerrs allege a constitutional violation; (2) the law regarding the alleged violation was clearly established at the time of the operative events; and (3) the record shows that the violation occurred, or at least gives rise to "a genuine issue of material fact as to whether the defendant actually engaged in conduct that violated the clearly-established law."  *See Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).  Only thereafter must we

17

visit the questions of whether Goar and Minshew acted within the scope of their authority and with the degree of reasonableness expected of a government official in their situation.  We proceed, on all counts, *de novo*.  *Id.*

The district court was correct in noting, as a preliminary matter, that the Kerrs have two viable causes of action against Goar and Minshew: malicious prosecution and civil conspiracy.  As a matter of law, Lyford's intervening, independent actions sever Goar's, Minshew's, Baggs's, and Fleig's responsibility for the Kerrs' alleged unreasonable seizure, false arrest, and false imprisonment.  *See Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988).

The district court also was correct in holding that the Kerrs' malicious prosecution claim implicated a clearly established right at the time of the events in question.  *See Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1303, 1305 (5th Cir. 1995).  Although in *Albright v. Oliver*, 510 U.S. 266, 275 (1994), the Court held that no such right exists under the Fourteenth Amendment, it did not reach the question of whether it exists under the Fourth Amendment. *See Albright*, 510 U.S. at 275.  *Albright,* therefore, left undisturbed our circuit's longstanding recognition of a Fourth Amendment right to be free from malicious prosecution.  *See Eugene*, 65 F.3d at 1303.

Moreover, *Albright* was decided in 1994, whereas the events

18

relevant to the Kerrs' malicious prosecution claim occurred from 1990 to 1993.  Thus, at the time of the events in question, the *Albright* decision could not have undermined the certainty of our circuit's clearly established right to be free from malicious prosecution.  This gives the Kerrs the basis they need to pursue their civil conspiracy claim, in that a § 1983 civil conspiracy claim must be based on the breach of a constitutional right.

This brings us to the third and final threshold question: "whether the showings made by the parties create a genuine issue of material fact as to whether the defendant actually engaged in conduct that violated the clearly-established law." *Rich,* 841 F.2d at 1563 (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).  That is, have the Kerrs satisfied the *prima facie* elements of their claims?  *See Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998).  Because this case is before us on appeal from summary judgment, the Kerrs need only demonstrate the existence of a genuine dispute of material fact regarding defendants' conduct.

The elements of a claim for malicious prosecution are:

1.    criminal action commenced against the plaintiffs;

2.    that the prosecution was caused by the defendants or with their aid;

3.  that the action terminated in the plaintiffs' favor;

4.  that the plaintiff was innocent;

5.  that the defendants acted without probable cause;

19

6. that the defendant acted with malice; and

7. that the criminal proceeding damaged the plaintiff.

*See Hayter v. City of Mount Vernon*, 154 F.3d 269, 275 (5th Cir. 1998). The elements of civil conspiracy are (1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). The Kerrs' civil conspiracy claim is contingent on the success of their malicious prosecution claim, which is the only tenable § 1983 violation here.

The district court found that the Kerrs had made out their *prima facie* cases of malicious prosecution and civil conspiracy. The court erred, however, by failing to examine whether the record supported the Kerrs' allegations. *See Sorenson*, 134 F.3d at 328. Although most of the elements of the malicious prosecution claim are undisputably satisfied, at least one of them lacks substantiation: The record does not establish that the prosecution was wanting in probable cause, nor does it establish a genuine, material factual dispute regarding this element.

For purposes of malicious prosecution, probable cause means "the existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of

20

the crime for which he was prosecuted."[12]  To the extent that the facts undergirding the probable cause determination are undisputed, we may resolve the issue as a matter of law.  *Blackwell v. Barton*, 34 F.3d 298, 305 (5th Cir. 1994).  To prevail, the Kerrs must demonstrate that either (1) the record affirmatively establishes that probable cause was lacking or (2) enough genuine, material factual disputes exist regarding the elements of probable cause that the ultimate finding of probable cause is the subject of a genuine, material factual dispute.[13]  They have demonstrated neither.

Defendants put forth the following evidence in support of a finding of probable cause: statements of the child witnesses implicating the Kerrs in their own sexual abuse and in Wilson's abduction, rape and murder; medical examinations of the children that revealed scarring consistent with their tales of sexual molestation; confessions and statements supplied by adult witnesses Geer, Martin, and Wanda Kerr, verified by polygraph, consistent with those of the children in implicating the Kerrs in the kidnaping, rape, and murder of Wilson; corroborative physical

---

[12] *Moore v. McDonald*, 30 F.3d 616, 620 n.2 (5th Cir. 1994) (quoting *Pendleton v. Burkhalter*, 432 S.W.2d 724, 727 (Tex. Civ. App.SSHouston [1st Dist.] 1968, writ ref'd n.r.e.)).

[13] To sustain a summary judgment, we must find that the undisputed facts support a finding of probable cause, a mixed question of fact and law. *Blackwell*, 34 F.3d at 305.  A genuine, material factual dispute as to some of the elements of the probable cause calculus does not preclude an affirmance, however, for probable cause still could be found based upon the totality of the undisputed elements.

21

evidence such as masks, knives, and other instrumentalities of restraint and torture that were referred to by the children. Additionally, an infrared scanning device and a cadaver-sensing dog suggested the presence of human remains on the Kerr's property, and bones (albeit not conclusively human) were unearthed. Lastly, the shed in the Kerrs' backyardSSwhich had been identified by some of the children and the adults as the place where Wilson's body had been keptSSwas also alerted to by the dog and, suspiciously, showed signs of recent washing and repainting.

The Kerrs counter with evidence suggesting a lack of probable cause. They are persuasive in averring that the statements of the children are unreliable in light of the manner in which they were obtained. The testimony of their expert, Dr. Perry, and evidence of the criticisms leveled against Goar and Minshew by TDHS create a genuine issue of material fact as to whether the children's statements could give rise to, or even contribute to, a finding of probable cause.

The record does reveal several instances in which the children made such statements spontaneously and voluntarilySSnot in response to the "holding technique" or any other form of coercive questioning. Furthermore, the defense's expert witness, Dr. Heger, found the defendants' handling of the children "sensitive," "appropriate," and "reasonable." Nonetheless, construing all reasonable inferences in favor of the nonmovant, we are compelled to conclude that the mishandling of the children by the

22

investigators so tainted their recollections as to render their statements nugatory, thereby removing this factor from the probable cause calculation.

The Kerrs also point to Wendell Kerr's alibi. R.S., Wanda Kerr, and Martin identified Wendell Kerr as a participant in the Wilson murder, and thus his substantiated alibi casts doubt on their credibility. This evidence raises a genuine material dispute, however, only with regard to *Wendell Kerr's* participation in Wilson's disappearance, not in regard to Eugene and Geneva Kerr's involvement. At best, this alibi evidence can be viewed as negating the positive inference we otherwise would have read from the successful polygraph testing of these witnesses, for it has raised a genuine issue of material fact as to their credibility.

Finally, the Kerrs' claim that Martin and Wanda Kerr recanted their original statements and that those statements were elicited via coercion and manipulation. We find no support for such claims in the record, however.[14] Indeed, the Kerrs cite largely to their third amended complaint, but not to any affidavit or other piece of substantive evidence, in support of these most serious claims.[15]

In summary, the totality of the medical examinations of the

---

[14] Lyford's personal notes of the investigation reveal reservations he had about the truthfulness of some of the statements given to him by his witnesses, especially with regard to some of the details. The notes also evince, however, a strong and reasonable belief in the overall truth of these statements and in the Kerrs' ultimate guilt in connection with the Wilson abduction and murder.

[15] *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (noting that pleadings do not constitute substantive evidence for summary judgment purposes).

23

children, the physical evidence recovered from the Kerr properties, and the statements of the adult witnesses provided defendants with probable cause to proceed with the prosecution of the Kerrs, Wendell Kerr's alibi notwithstanding.[16]  For this reason, we reject the malicious prosecution claim and, *a fortiori,* the civil conspiracy claim as well.  We need not, and therefore do not, reach the issues of whether Goar, Minshew, Baggs and Fleig acted within the scope of their authority, and whether a reasonable official in their position would have viewed their actions as unconstitutional.

AFFIRMED.

---

[16] The caselaw confirms our conclusion.  The best case of which we are aware in support of the Kerrs' position that qualified immunity should not attach  had facts significantly more compelling than those before us today.  In *Sanders v. English*, 950 F.2d 1152, 1154 (5th Cir. 1992), the malicious prosecution plaintiff not only was initially arrested under suspicious circumstances but also had an alibi that was corroborated by three credible witnesses.  Additionally, a fourth witnessSSwho had seen the robbery for which plaintiff was arrestedSStold police that someone else had committed it.  Conversely, *United States v. Wadley*, 59 F.3d 510, 512-13 (5th Cir. 1995), exemplifies how low the threshold for a finding of probable cause is:  There, we held that probable cause existed to arrest a suspect who merely had fled from police in a high crime area and "reached into his pocket" while doing so.

EDITH H. JONES, Circuit Judge, with whom EMILIO M. GARZA, Circuit Judge, joins, specially concurring:

I concur in the good opinion in this case, but I write to express my continuing dissatisfaction with this circuit's handling of a constitutional tort for malicious prosecution. In 1991, I questioned whether such a constitutional tort was authorized under the rubric of "substantive due process."[17] In 1994, the U.S. Supreme Court agreed that if a constitutional tort of malicious prosecution exists at all, it would have to be based on the Fourth Amendment rather than Fourteenth Amendment substantive due process.[18] But the Albright plurality, rather than endorsing a Fourth Amendment tort of malicious prosecution, declined to address the issue.[19] Two of the justices, Kennedy and Thomas, refused to recognize any constitutional tort for malicious prosecution, inasmuch as such a claim would merely duplicate adequate state law remedies.[20] Only Justice Ginsburg, in an individual concurrence, attempted to articulate a Fourth Amendment theory of malicious prosecution.[21]

---

[17]Brummett v. Camble, 946 F.2d 1178, 1180 n.2 (5th Cir. 1991).

[18]See Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807 (1994).

[19]See id. at 275, 114 S. Ct. at 812.

[20]See id. at 281, 114 S. Ct. at 816.

[21]See id. at 279, 114 S. Ct. at 814.

Albright has spawned controversy and confusion in the lower courts[22] -- but not in this court. After initially appearing tentative on the subject,[23] this court unblushingly cited one of our earlier Fourteenth Amendment malicious prosecution cases and held that the right under the Fourth Amendment to be free from malicious prosecution was "clearly established" in this circuit.[24] Subsequent cases have elaborated on Eugene, specifying that the circuit's malicious prosecution tort has the same elements as the relevant state law torts.[25]

The problem with the Fifth Circuit jurisprudence, as I see it, is two-fold. First, this court fails to recognize that Albright did not endorse a constitutional malicious prosecution tort at all. Second, even if Albright left room for such a claim under the Fourth Amendment, there is a significant difference

---

[22]See, for example, the thoughtful discussions in Taylor v. Meacham, 82 F.3d 1556, 1560-61 (10th Cir. 1996), and Reed v. City of Chicago, 77 F.3d 1049, 1052-54 (7th Cir. 1996). See generally 1A Martin A. Schwartz & John E. Kirklin, Section 1983 Litigation § 3.20, at 315-30 (3d ed. 1997) (discussing Albright and post-Albright conflicting circuit court rulings); Pinaud v. County of Suffolk, 52 F.3d 1139, 1154 (2d Cir. 1995) ("the Supreme Court's splintered decision in [Albright] . . . make[s] the status and validity of § 1983 malicious prosecution claims . . . uncertain to say the least.") (Calabresi, J.).

[23]See Johnson v. Louisiana Dept. of Agric., 18 F.3d 318, 320 (5th Cir. 1994).

[24]Eugene v. Alief Indep. Sch. Dist., 65 F.3d 1299, 1305 (5th Cir. 1995).

[25]See, e.g., Evans v. Ball, 168 F.3d 856, 862-63 (5th Cir. 1999).

26

between predicating the cause of action on the Fourth Amendment and the Fourteenth. On the most superficial level, if the grounds for the claim under the Fourth and Fourteenth Amendments were equivalent, there would have been no need to distinguish between those amendments in Albright.

Moreover, the tort of malicious prosecution fits uneasily within the Fourth Amendment. That amendment proscribes unreasonable searches and seizures and has been held to prohibit arbitrary law-enforcement actions up until the time of arraignment. To justify a Fourth Amendment malicious prosecution claim, then, one has to extend the period of "seizure" past arraignment. Only Justice Ginsburg was willing to make this leap in Albright, and the circuit courts are divided both on the application of the Fourth Amendment post-arraignment and on whether mere requirements of the posting of bond and appearance at pretrial hearings, without more, constitute a "seizure."[26] This court recently lined up on the side of Justice Ginsburg's concurrence without acknowledging the basis

---

[26]Compare Gallo v. City of Philadelphia, 161 F.3d 217, 222-25 (3d Cir. 1998) (indictment, bond, and travel restrictions constitute continuing seizure), and Murphy v. Lynn, 118 F.3d 938, 945 (2d Cir. 1997) (same, over a dissent by Judge Jacobs); with Riley v. Dorton, 115 F.3d 1159, 1162-63 (4th Cir. 1997) (en banc) (rejecting continuing seizure theory for claim alleging post-arrest excessive force), and Reed, 77 F.3d at 1052-54 (questioning continuing seizure rationale). This court has held that the Fourth Amendment does not apply for purposes of excessive force claims after arrest and during pretrial detention. See Brothers v. Klevenhagen, 28 F.3d 452, 456 (5th Cir. 1994).

27

for debate.[27]  The identity of the proper defendant in a malicious prosecution claim founded on the Fourth Amendment is also a difficult question, as Justice Ginsburg and other courts have realized.[28]

As constitutional issues go, the status of a constitutional tort of malicious prosecution may seem like small potatoes.  But I wish that our court had paid more attention to the ramifications of Albright.  It is far from clear to me that, if Albright is harmonized with other applicable precedents concerning the Fourth Amendment, the constitutional "tort" of malicious prosecution will survive in the form we have created.

With this admonition, I concur.

---

[27]See Evans, 168 F.3d at 861.

[28]A malicious prosecution claim against police officers is "anomalous," as Justice Ginsburg noted.  Albright, 510 U.S. at 279 n.5, 114 S. Ct. at 816 n.5.  For one thing, prosecutors will enjoy absolute immunity.  See id.  The Justice added that "Albright's theory raises serious questions about whether the police officer would be entitled to share in the prosecutor's immunity."  See id.; see also Taylor, 82 F.3d at 1563; Reed, 77 F.3d at 1053.