IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-50442
_____


ALAN BROWN; LOIS BROWN,

Plaintiffs-Appellees,

versus

WILSON COUNTY; Etc.; ET AL.,

Defendants,

CATHERINE TULL, Doctor of Veterinary
Medicine, Texas Department of Health Officer
in her official and individual capacity,

Defendant-Appellant.

_____

Appeal from the United States District Court for
the Western District of Texas
(U.S.D.C. No. SA-97-CV-1473-OG)
_____

May 30, 2000

Before KING, Chief Judge, REAVLEY and STEWART, Circuit Judges.

REAVLEY, Circuit Judge:[*]

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Catherine Tull appeals the denial of her motion to dismiss the federal and state claims brought against her. She claims that she is entitled to qualified and official immunity. We agree, and reverse and render judgment in her favor.

BACKGROUND

As alleged in the third amended complaint[1] of appellees Alan and Lois Brown, on January 2, 1997 some 75 persons, consisting of sheriff's deputies, an animal control officer, camera crews and other members of the media, and various animal activists descended on their farm. These alleged "trespassers" roamed over plaintiffs' small farm and removed a large number of animals from the property. The Browns raised dogs and cats for sale. The activists wanted to shut down the breeding operation and generate sympathy and contributions. To the Browns, the dogs and cats were their "livestock." To defendants, the Browns ran a "puppy mill."

The Browns alleged that the animal control officer, Cicherski, and an animal activist, Tracy Frank, first planned a covert search and inspection of the Brown's property. These two and other defendants responded to an ad and pretended to be interested in purchasing a puppy. These defendants, without permission, wandered over to the breeding area and observed the adult animals. Tracy Frank then contacted the media and other animal activists to participate in a "raid" on the property. Frank prepared an "expert" report (the Frank report) detailing the condition of the animals.

_____

[1] The third amended complaint is the live complaint and is hereafter referred to as "the complaint."

Cicherski signed three affidavits regarding the condition of the animals, one on December 30, 1996, and two on January 2, 1997. Based on one or more of the affidavits the sheriff, defendant Tackitt, applied for seizure warrants. By prior agreement, on January 2, 1997, animal activists, the media, deputies and Cicherski met at the courthouse. A judge signed seizure warrants.

A throng of activists, deputies, and the media then went to the Browns' farm. The Browns allege that the various participants in the execution of the seizure warrants wandered all over the property, that the number of participants was unduly large, that there was no justification for allowing the media on their property, and that the warrants were based on inaccurate information and were not based on probable cause. All but eight dogs allegedly in poor health were returned on the same day as the seizure. Twelve dogs were stolen or disappeared in the fray. Of the eight dogs not immediately returned, one died (allegedly killed by a defendant veterinarian), and seven were returned to the Browns.

The Browns sued numerous defendants, including Wilson County, government officials, animal activists, and media defendants. The Browns alleged a federal cause of action under 42 U.S.C. § 1983 and several state law claims.

The asserted factual basis of Tull's liability consists of the following factual allegations of the complaint. Paragraph 52 alleges that prior to the January 2, 1997 seizure, animal activist Judy Gossett wrote a letter to Tull requesting her advice on how to put the Browns out of business. Paragraph 53 alleges that Cicherski communicated

3

with Tull by telephone and "Tull instructed Cicherski to seize all of the Browns' animals, without having even seen any of the Browns' animals, even though, because of a lack of policies and procedures to guide him and a lack of any supervision by Wilson County, Cicherski sought Tull's advice regarding how many and which of the Browns' animals should be included in the seizure warrant." Paragraph 54 alleges that Cicherski relied on Tull's advice and knew that "Tull was familiar with Health and Safety Code provisions pertinent to seizing animals," and that "Tull's advice to Cicherski was made with intentional indifference to and reckless disregard for the actual condition of the specific animals to be seized and with complete disregard for the dictates of the Health and Safety Code."

Paragraphs 56, 57, and 58 allege that prior to the January 2 incident, Tull received from Cicherski a copy of the Frank report, from which Tull had notice that a seizure of the dogs was planned, that animal activists and the media would participate, and that a seizure of plaintiffs' animals "was being planned as a media event." From the time Tull saw the report, she allegedly knew that the media and animal activists "were conspiring to jointly participate in the raid on the Browns' private property with the express intent to seize all animals and to publicize the seizure for reasons other than legitimate law enforcement business." Paragraph 60 alleges that despite this knowledge, Tull and others made no effort to dissuade Cicherski from conducting the raid and otherwise protect plaintiffs' constitutional rights.

Various defendants including Tull filed motions to dismiss. In response to Tull's

4

motion, the Browns stipulated that they are suing Tull in her individual capacity only. A magistrate judge recommended that Tull's motion be granted. The district court issued a lengthy order ruling on various motions including Tull's motion to dismiss. The court concluded that the complaint did not state a claim under the "failure to dissuade" theory asserted in paragraph 60, but otherwise denied Tull's motion. Tull appeals the denial of her motion.

## DISCUSSION

In reviewing a motion to dismiss, the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. See Campbell v. Wells Fargo Bank, N.A., 781 F.2d 440, 442 (5th Cir. 1986). The district court may not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

Ordinarily, an order denying a motion to dismiss is interlocutory and is not appealable. An exception allowing for interlocutory appeal exists where the motion is based on qualified immunity and the review "turns on an issue of law." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). Because we assume the facts alleged in the complaint are true, this appeal turns on an issue of law, namely whether the Browns have stated a claim against Tull in the face of Tull's defense of qualified immunity, and we therefore have appellate jurisdiction.

5

We have frequently written on the doctrine of qualified immunity. Before reaching the issue of qualified immunity, we must decide whether the plaintiff has stated a claim for a violation of a constitutional right. See Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402, 1404 (5th Cir. 1995). "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all . . . .'" Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999). If the court finds no cause of action for constitutional injury, it need not address the issue of qualified immunity. See Quives v. Campbell, 934 F.2d 668, 671 (5th Cir. 1991).

Assuming that plaintiff has alleged a violation of a constitutional right, qualified immunity attaches to individual defendants' actions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The standard is one of "objective legal reasonableness" rather than good faith. See id. at 819. To overcome the defense of qualified immunity, the plaintiff must show that the defendant's conduct was not objectively reasonable and that the defendant violated clearly established law. See Burns-Toole v. Byrne, 11 F.3d 1270, 1274 (5th Cir. 1994). The court must "determine whether that right was clearly established at the time of the alleged violation." Wilson, 526 U.S. at 609 (quoting Conn, 526 U.S. at 290). Whether a right is clearly established is typically treated as a question of law. See Behrens v. Pelletier, 516 U.S. 299, 313 (1996).

If we determine that the official's conduct was unconstitutional and violated clearly established law, we address whether that conduct was objectively reasonable. See Wren v. Towe, 130 F.3d 1154, 1159 (5th Cir. 1997); Eugene v. Alief Ind. Sch. dist., 65 F.3d 1299, 1305 (5th Cir. 1995). "Objective reasonableness is a matter of law for the courts to decide, not a matter for the jury." Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999).

"As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Assuming the facts alleged in the complaint are true, the Browns failed to assert a cognizable § 1983 claim against Tull. We read the key issue to be whether Tull can be held liable given her indirect involvement in the seizure. There are no allegations in the complaint that (1) it was Tull's idea to secure a warrant and seize of the animals, (2) Tull was physically present at the raid or personally participated in it, (3) Tull participated in drafting the seizure warrants or the affidavits supporting the warrants, or supplied any information to the court that issued the warrants, (4) Tull had any legal authority to request or order a seizure of the animals, or ever purported to have such authority over law enforcement officials, (5) Tull, a veterinarian with no legal training, had any duty under state law to ensure that law enforcement seizures are conducted legally; or (6) Tull had any control over who would participate in the raid or the manner in which the seizure of the animals was conducted. Even if Tull knew that a seizure was being contemplated

7

and suggested or recommended that all the animals be seized, the law does not hold her responsible for causing the seizure. Her tangential involvement in the raid, in our view, was too remote to impose § 1983 liability.

As a general proposition, "causation is an element of a section 1983 claim," and the defendant's "actions must have actually caused" the constitutional deprivation. Hart v. O'Brien, 127 F.3d 424, 446 (5th Cir. 1997). Our cases have held that this causation element is met by (1) personal participation in the actions that deprived the defendant of his constitutional rights, or (2) supervisory authority over those who personally participated in the unconstitutional conduct, and a breach of a duty imposed by state or local law that can be said to have caused the constitutional injury. See Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402, 1412 (5th Cir. 1995); Lozano v. Smith, 718 F.2d 756, 768 (5th Cir. 1983); Barksdale v. King, 699 F.2d 744, 746 (5th Cir. 1983). Tull does not fall into either category. She did not personally participate in the raid, and she had no supervisory authority over those who did or a legal duty to supervise them.

The district court cited Hart, supra. There we held that an officer can be held liable under § 1983 "for swearing to false information in an affidavit in support of a search warrant, provided that: (1) the affiant knew the information was false or would have known it was false except for the affiant's reckless disregard for the truth; and (2) the warrant would not establish probable cause without the false information." 127 F.3d at 442. We further held that "[a] governmental official violates the Fourth Amendment when he deliberately or recklessly provides false, material information for use in an

8

affidavit in support of a search warrant, regardless of whether he signs the affidavit." Id. at 448-49. This case is not dispositive. Tull did not swear out the affidavit or affidavits used in support of the seizure warrants. Cicherski signed the affidavits. The complaint does not allege that Tull provided false, material information for use in any warrant. While she may have recommended or even "instructed" Cicherski to seize all the animals, complaint ¶ 53, there is no allegation that Tull supplied any on the factual information used by Cicherski in the affidavits he signed. On the contrary, the complaint is clear that Tull had no personal knowledge of the condition of the animals, and that Cicherski knew this. There is further no allegation that Tull, a veterinarian, had any legal duty to make sure that the warrants complied with constitutional requirements.

The Browns argue that Tull "conspired" with others and can be held liable under this theory. "The elements of civil conspiracy are (1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right." Kerr v. Lyford, 171 F.3d 330, 340 (5th Cir. 1999). "To establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act." Arsenaux v. Roberts, 726 F.2d 1022, 1024 (5th Cir. 1982). "[M]ore than a blanket of accusation is necessary to support a § 1983 claim." Id. "Mere conclusory allegations of conspiracy cannot, absent reference to material facts, survive a motion to dismiss." Id. "A conclusory allegation of conspiracy is insufficient. Specifically, plaintiffs must identify an illegal objective of the agreement among [the alleged conspirators]." Rodriguez v. Neeley, 169 F.3d 220, 222

9

(5th Cir. 1999) (citation omitted).

The complaint alleges that prior to the seizure of the animals, Tull received a copy of the Frank report, and that Cicherski had several telephone conversations "conspiring with Tull." Paragraph 53 of the complaint alleges that "Tull instructed Cicherski to seize all of the Browns' animals," when Cicherski sought Tull's advice regarding how many of the animals to seize. Paragraph 54 alleges that Tull's advice was made without regard "for the actual condition of the specific animals to be seized and with complete disregard for the dictates of the Health and Safety Code."

Read liberally, the complaint alleges that Tull agreed with Cicherski that all the animals should be seized even if the Frank report or other information did not establish probable cause that all the animals were being mistreated. To state a viable conspiracy claim, however, the complaint must do more than allege that Tull approved of or recommended the seizure of the animals; to be liable under a conspiracy theory she had to specifically agree with others that it would be conducted in an illegal manner. Further, in light of her defense of qualified immunity, the illegality had to be clearly established, and her conduct had to be objectively unreasonable.

Texas law provides that a county or municipal animal control officer may apply for a seizure warrant if the officer "has reason to believe that an animal has been or is being cruelly treated." Tex. Health & Safety Code Ann. § 821.022(a) (West.1992). The court shall issue the warrant and set a hearing "[o]n a showing of probable cause to believe that the animal has been or is being cruelly treated." Id. § 821.022(b). "Cruelly

10

treated" is broadly defined in include "tortured, seriously overworked, unreasonably abandoned, unreasonably deprived of necessary food, care, or shelter, cruelly confined, or caused to fight with another animal." Id. § 821.021. Under these statutory provisions Texas law recognizes "a willingness, even if conditional, to view animals as something more than personal property subject to the vicissitudes of an owner's rage, abuse, or neglect." Pine v. State, 921 S.W.2d 866, 873 (Tex. App.–Houston [14th Dist.] 1996, writ dism'd w.o.j.).

The Frank report indicated that most if not all of the animals were being cruelly treated.[2] Further, the law is not clearly established that an animal control officer cannot constitutionally seize all of a large number of animals if a substantial number of them are being mistreated. Common sense suggests that the mistreatment of some animals might suffice to establish probable cause for the temporary seizure of all the animals in these

---

[2] The report, attached to plaintiffs' original complaint, states that on her visit to the "puppy mill," Frank and her companions found "over 150 dogs in horrible, filthy cages and pens, wallowing in their own excrement, many without water, most without food. Many of the animals were obviously ill, with runny noses and eyes, many were starving, and many were deformed, presumably due to inbreeding. Every long haired dog we observed was covered with matted fur and all of the dogs and cats were extremely dirty. The saddest part of all was the pitiful way they desperately wailed and jumped whenever you came near, the helpless pleas for attention and love. It appeared that none of these animals was ever allowed out of the cramped filthy cages. At least 100 dogs were located outside in tiny, crude, filthy uncovered pens that were completely crowded, and several cats were crammed in old dilapidated chicken coops. There were another 50 or 60 animals inside the ramshakled old falling down farm house, some crowded with as many as five dogs to a small kennel. . . . The smell in that house was overwhelming. . . . One dog in a kennel in the house was not moving. I cannot impart to you how abhorrent the conditions of this place were. There were also a number of emaciated horses and cows on the premises. . . . These people who are abusing these defenseless animals should be prosecuted to the full extent of the law."

11

circumstances. The Browns can point to no clearly established law to the contrary. We are further of the view that if, as alleged in the complaint, Cicherski turned to Tull for advice on how may of the animals to seize, Tull was not objectively unreasonable in opining that if a seizure was going to occur all the animals should be seized, as opposed to some of them, in light of the Frank report which Tull had allegedly seen. The report merely documented a trip to the Browns' farm that Cicherski had made with Frank. Tull was not responsible for the content or accuracy of the report, as Cicherski knew. Whether the application for a seizure warrant was supported by probable cause was a matter for the court to whom the application was made. A objectively reasonable veterinarian in Tull's position would assume, correctly, that the determination of which animals could be seized was a legal matter for the court, and that she was free to give her lay opinion on this issue to Cicherski for whatever it was worth.

The other conspiracy allegations in the complaint amount, at most, to a conclusory "blanket of accusation" against Tull. Arsenaux, 726 F.2d at 1024. The complaint does not consistently or clearly specify the participants in the conspiracy, when such a conspiracy was hatched, the agreement the conspirators allegedly reached, the illegal act the parties agreed to commit, or the specific intent of Tull and the other defendants to commit an illegal act. Instead, it indiscriminately uses the terms "conspired" and "conspirators" in a manner that, in our view, cannot survive Tull's motion to dismiss.[3]

---

[3] The participants in and nature of the alleged conspiracies vary from paragraph to paragraph in the complaint. For example, ¶¶ 49 and 50 allege that Frank "conspired" with other

12

Plaintiffs also sued under state law, and Tull claims official immunity under state law. Under Texas law, government officials are immune from suits arising from performance of their discretionary duties in good faith as long as they were acting within the scope of their authority. See City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). A state official acts in good faith "if any reasonably prudent officer could have believed that the conduct was consistent with the plaintiff's rights." Cantu v. Rocha, 77 F.3d 795, 808 (5th Cir. 1996) (emphasis added).

In Chambers, the court recognized that the test for "good faith" under state immunity law "is derived substantially from the test that has emerged under federal immunity law for claims of qualified immunity in § 1983 cases." Id. at 656. We conclude that state law likewise provides immunity for Tull's alleged actions in these circumstances. Official immunity under state law "hinges on whether the official's activities were undertaken in 'good faith,' that is whether they were objectively reasonable." Hart v. O'Brien, 127 F.3d 424, 450 (5th Cir. 1997). For the reasons

---

animal activists and the media defendants to participate in the raid, and ¶ 51 alleges that Frank "conspired" with defendant Conover, a veterinarian, to board animals that were seized. Paragraph 53 alleges that prior to January 2, 1997, Cicherski had numerous telephone conversations "conspiring" with Tull that all the Browns' animals should be seized. Paragraph 57 alleges that the Television Defendants and the Animal Activists "had been and were conspiring to jointly participate in the raid." Paragraph 99 alleges that "conspirators" "Wilson, Cicherski, Tull, Sheriff Tackitt and the Sheriff's Deputies deputies, Conover, the Animal Activists, the Television Defendants . . . and unidentified animal activists" jointly conceived and planned the raid on the Browns' property and livestock. Paragraph 102 alleges that Cicherski, Tackitt, the Sheriff's Deputies and Wilson "conspired, planned, engaged in and supervised" the participation of the Animal Activists, the Television and Newspaper Defendants, and others in the January 2, 1997 raid. Paragraph 122 alleges that "[t]he Tortfeasors and Patricia Massey conspired to invade the Browns' premises on January 2, 1997."

13

discussed above, Tull's alleged advice to seize all rather than some of the animals was objectively reasonable.

For the foregoing reasons, the order denying Tull's motion to dismiss is reversed, and judgment is rendered in favor of Tull.

REVERSED and RENDERED.