Willie O. THOMAS, Plaintiff,

v.

Ricky MURRAY, et al., Defendants.

No. Civ.A. 3:98CV1306L.

United States District Court,
N.D. Texas,
Dallas Division.

May 31, 2000.

Douglas R. Larson, Law Office of Douglas R. Larson, Mesquite, TX, for plaintiff.

Thomas P. Brandt, Stephen D. Henninger, Fanning Harper & Martinson, Dallas, TX, for defendants.

## MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court are Defendants Navarro County, Leslie Cotten (official capacity), and Ricky Murray's (official capacity) Motion for Summary Judgment, filed February 17, 2000; and Defendant Ricky Murray's (individual capacity) Motion for Summary Judgment, filed February 17, 2000. After careful consideration of the motions, responses, reply, and applicable authority, the court **grants** the motion for summary judgment of Navarro County and **grants** the motion for summary judgment of Defendant Ricky Murray in his individual capacity. With respect to the motion for summary judgment of Defendants Cotten and Murray in their official capacities, the court need not address it because the court **dismissed** this action against these two Defendants in their official capacities by its order of February 22, 2000.

### I. *Procedural and Factual Background*

Willie O. Thomas ("Plaintiff" or "Thomas") filed this civil rights action against Defendants Ricky Murray ("Murray"), Leslie Cotten ("Cotten"), and Navarro County on June 4, 1998, pursuant to 42 U.S.C. §§ 1983 and 1988. Murray was sued in his individual and official capacities, and Cotten was sued only in his official capacity.

Thomas contends that Murray used excessive force against him because the use of force was unnecessary and that Murray detained him without legal justification. Thomas also contends that by policy or custom, Navarro County (through Defendant Cotten) has failed to train Murray regarding the proper use of force by a law enforcement officer and has failed to establish procedures to prevent the use of excessive force.

Defendants contend that Murray's actions toward Thomas were reasonable, that probable cause or reasonable suspicion justified the detention of Plaintiff, and that Murray's use of force was justified under the circumstances. Murray contends that he is entitled to qualified immunity because his actions did not violate clearly established federal law. Finally, Defendants contend that no policy or custom of Navarro County or Sheriff Cotten caused or was the moving force behind any alleged constitutional violation to Thomas.

Defendants move for summary judgment, contending that there is no genuine issue of material fact and that they are therefore entitled to judgment as a matter of law. Plaintiff, on the other hand, contends that summary judgment should be denied because genuine issues of material fact are in dispute.

As expected, there are disputed facts in this case; however, many are not in dispute. When the facts are in dispute, they are presented and viewed in the light most favorable to Thomas as the nonmovant. The court, however, does not consider a fact to be in dispute merely by a conclusory or speculative statement or assertion that is disputed. Competent summary judgment evidence must show that it is disputed. Finally, the court only cites and relies on those facts which are relevant and material to deciding the pending motions. The court now sets forth the facts it relies on to decide the pending motions for summary judgment.[1]

In June 1996, Thomas and his wife, Hazel, operated a small fruit stand and a fireworks stand on Highway 31 in Navarro County, Texas. Plaintiff and his wife lived nearby. The fruit stand is located about seventeen miles west of Corsicana, Texas, at the intersection of Highway 31 and FM 667. The fruit stand was not located in any incorporated or unincorporated city, village or town. The location of the fruit stand and fireworks stand was in a rural area.

On Saturday evening, June 29, 1996, shortly before dark, a man known to Plaintiff as Cecil Sanders ("Sanders") came to Plaintiff's businesses on Highway 31. Sanders had a man with him who Sanders had picked up because the man's car had broken down. Sanders arrived in his van with his wife and children. This man, who Thomas now knows as John Williams ("Williams"), was much taller, younger, and bigger than he (Thomas). Thomas, at the time of the incident, was 68 years old.

Williams desired to use the phone to call for assistance. Thomas told Williams that he did not have a pay phone but Williams could use Plaintiff's business phone located in the fruit stand, as long as his call was local and not long distance. Thomas then took Williams into the fruit stand to use the phone. Williams had trouble getting his call to go through and loudly used a number of curse words. Thomas asked (instructed) him to stop cursing. Williams eventually contacted someone on the phone, and Plaintiff spoke to the man on the phone to inform him of the location of his (Plaintiff's) place of business.

Williams got back on the phone and began cursing again. Thomas told Williams again to stop cursing and that he would have to get off the phone Williams then told Thomas that he was not getting

---

1. The facts regarding Plaintiff's allegations of policy or custom are set forth as necessary in Section IV(C) of this opinion.

off the phone until he got through using it. When he refused, Thomas became afraid and believed that Williams might harm him or his wife.

Thomas then took his .357 Magnum pistol from its place near the cash register and put it in his right back pants pocket. Williams observed Thomas as he retrieved the pistol and then started towards the east door of the fruit stand, but then returned to the phone and picked it up. Thomas told Williams to hang up the phone and to leave his place of business. Williams then angrily hung up the phone and slowly walked out of the fruit stand. Williams walked toward Corsicana on Highway 31. At that point, Thomas closed and locked the east door to the fruit stand, and went out the west door of the fruit stand to the fireworks stand.

As the event unfolded between Plaintiff and Williams, Murray was on duty as a patrol deputy for the Navarro County Sheriff's Office in a squad car. Murray noticed a man walking on the shoulder of Highway 31, approximately one fourth mile east of FM 667. Murray stopped to ask this man if he needed any assistance. The man identified himself to Murray as John Williams, and stated Murray "must have" wanted to talk to him because of what had happened at the store. Murray asked Williams to what was he referring.

Williams informed Murray that he was in the area to visit friends, that his vehicle had broken down, that he had been given a ride to a fruit stand/produce store nearby, and that he had asked to use the phone at the fruit stand. Williams told Murray that the store had no pay phone, and that he had asked to use the private phone to make a collect call. The owner of the store allowed him to use the phone. After making the call, Williams stated that Thomas demanded that he (Williams) pay him for the call. Williams refused, and told Murray that he did not pay for the call because it had been collect. Williams told Murray that Thomas became angry, pulled a gun out, pointed it at his (Williams's) head, and told him to leave his store. Williams told Murray that he then left the store.

During the conversation, according to Murray, Williams appeared nervous and as if something was not "right emotionally." Murray ran a check on Williams's driver's license and discovered that he was not wanted but did have a criminal history. Williams's transient status, nervous demeanor, and criminal history, caused Murray to suspect that something was not "quite right" with his story. Murray had not been by the store in question that day, and he did not know at that time what might have occurred, that is, whether Williams had had a gun pointed at him, whether there had been a disturbance at the store, whether Williams had been involved in a crime at the store, or whether there was some other explanation for Williams's conduct. Williams informed Murray that he wanted to press charges against Thomas for pointing the gun at him. Because of Williams's nervous demeanor, his criminal history, and his own lack of knowledge about what had occurred, Murray did not want to leave Williams there by the side of the road while he went to the store to investigate. Murray asked Williams to accompany him, and they proceeded to Thomas's fruit stand (store) in Murray's marked patrol car.

Approximately twenty to thirty minutes after Williams had initially left the fruit stand, Murray and Williams arrived at the fruit stand, got out of the car, and entered the fruit stand through the west door. According to Plaintiff, he left the fireworks stand, and he and his wife went into the fruit stand. Murray said to Thomas, "This man said you pulled a gun on him." Thomas told Murray that he did not pull a gun on Williams, and Murray repeated, but in a stronger voice, "This man said you pulled a gun on him." Murray then asked for Thomas's gun. Thomas told Murray that the fruit stand and gun were his property and that he was not surrendering

his gun. Thomas did not surrender the gun. Murray then told the Plaintiff again, in a louder and more demanding voice, to give him the gun. Murray then grabbed Plaintiff and pushed Plaintiff up against the north wall of the fruit stand, knocking the bottles of Watkins products off the wall. Murray then stuck the barrel of his gun in Thomas's throat under his left jaw. While Murray had Thomas pinned to the wall, he called for backup on his radio. Thomas never took his gun out of his hip pocket and did not touch it at any time before Murray took it from him. Thomas never pointed this gun or any other gun at either Murray or Williams.

When Murray pushed Thomas against the wall, Thomas fell backwards into the wall. Thomas's head struck a nail on the wall that was there to hold things Thomas and his wife had for sale. Plaintiff's elbow struck the wall as well. Thomas lost consciousness for some period of time, and the next thing he remembered was sitting in a chair by the cash register. Murray told Thomas his name and asked Thomas for his name, which Thomas gave to Murray along with his address. At some point, another deputy came in the store. Murray filled out his report. Murray told Thomas that he was sorry he had "roughed him up." Murray put Thomas's .357 Magnum and .22 caliber pistols on the table in the kitchen in the fruit stand. Murray and the other deputy then left the location.

Murray's account of what transpired at Plaintiff's fruit stand between him and Plaintiff does not differ greatly from Plaintiff's account insofar as the relevant and material facts are concerned, except whether Thomas ever removed the pistol from his hip pocket. To put the incident in question in proper perspective, the court in the five succeeding paragraphs sets forth Murray's account of his involvement with Williams and Thomas at the fruit stand.

As Murray and Williams walked into Thomas's fruit stand (store), Murray noticed a small handgun in a holster on the counter next to the cash register. Williams pointed to the gun and stated that it was the gun that had been pulled on him. As Williams made this statement, Thomas entered the store. Thomas stated that the gun on the counter was not the gun he had pulled. Thomas stated that the gun he had pulled was the one in his back pocket, and he pulled the handgun from his back pocket.

According to Murray, he asked Thomas to put the handgun away. Thomas continued to hold the gun, was talking loudly, and asked Murray what was he doing and why he was there with Williams. Murray again told Thomas to put the gun down. Thomas returned the gun to his back pocket. Murray was not comfortable with Thomas's possession of the firearm during his investigation. He was unsure what had occurred previously at the store. According to Murray, Thomas appeared agitated. Murray told Thomas he was trying to figure out what had transpired between him and Williams and that, for everyone's safety, he would need to hold onto his (Thomas's) gun until he had completed his investigation. Thomas refused to surrender his weapon, stating that it was his weapon and that he was not surrendering his gun to Murray. Murray again told Thomas that, for everyone's safety, until he determined what had happened, he would need to hold on to his handgun.

Thomas again refused to surrender his weapon to Murray. Murray states that Thomas began reaching back with his right hand to the pocket where his gun was. Murray stepped forward, put his left hand against Thomas's chest and pushed Thomas back against the wall behind him (Thomas). As he did so, Murray drew his service revolver with his right hand, and placed it underneath Thomas's chin. He ordered Thomas to keep his hands up, took his left hand off Thomas's chest and reached around and pulled Thomas's handgun from his pocket. Murray placed the gun in his own pocket, lowered his weapon,

backed away from Thomas, and asked Thomas to have a seat, which he did.

After Thomas was seated, Murray called the Sheriff's Office dispatch for a back-up officer to be sent to the scene. He then questioned Thomas as to what had occurred. Thomas stated that Williams had come to his store and asked to use the phone. Thomas allowed him to do so, but at some point, Williams began cursing, and Thomas asked Williams to leave the store. At some point during Murray's investigation, Deputy Chapman arrived. Murray gave him the pistol by the cash register and retained possession of the one he had retrieved from Thomas while he concluded the investigation. After getting Thomas's side of the story, Murray inquired of Williams whether he wished to file any charges. Williams initially indicated that he wanted to file charges, but then changed his mind and stated he simply wanted to leave. Murray instructed Williams to go outside and wait by the patrol car. Murray then apologized to Thomas for the events that had occurred and explained to him that he could not have him brandishing a weapon and refusing to surrender it during his investigation, and that his (Thomas's) refusal to surrender it had put him in fear of his (Murray's) safety and the safety of the other persons in the room. Thomas, according to Murray, stated that he understood.

Murray placed the handgun that he had taken from Thomas and the handgun that he had given to Chapman on a counter in a closet at the rear of the store. The shells were removed from each gun and placed on the counter beside the guns. Murray informed Thomas where he was putting the weapons, shook hands with Thomas, and he and Deputy Chapman left the store.

The injury to the Plaintiff's head allegedly caused him to sustain a concussion. The blow to the Plaintiff's elbow caused him to temporarily lose the use of his left arm. For several months after his injury, Plaintiff frequently had terrible headaches.

He also suffered double vision. According to Plaintiff, his doctors diagnosed these problems as being related to the blow to his head that he received when Murray "slammed" him against the wall.

## II. *Summary Judgment Standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Company,* 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas,* 136 F.3d at 458.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id., see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. *Qualified Immunity Standard*

 Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known" *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A defendant official must affirmatively plead the defense of qualified immunity. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Defendant Murray has pleaded this defense.

In deciding a motion for summary judgment that raises the defense of qualified immunity, the court must *first* decide "whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999), citing *Siegert v. Gilley*, 500 U.S. 226, 232–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *see also Kerr v. Lyford*, 171 F.3d 330, 339 (5th Cir.1999). The second prong of the test requires the court to make two separate inquiries: whether the right allegedly violated was clearly established at the time of the event giving rise to the plaintiff's claim, and if so, whether the conduct of the defendant was objectively unreasonable. *Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999). Although many cases continue to state that the determination of the qualified immunity issue requires the application of a bifurcated test, the analytical framework for resolving issues of qualified immunity necessarily requires, or may require, a *three-step* analysis. *See Kerr v. Lyford*, 171 F.3d at 339; *Evans v. Ball*, 168 F.3d at 860; *Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir.1998); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir.1995), *cert. denied*, 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

 Whether a defendant acted within the scope of his authority performing a discretionary function and whether a reasonable official in his position would have deemed his conduct unconstitutional are not to be considered by the court unless each part of the three-step inquiry has been answered affirmatively on behalf of the plaintiff. *Kerr v. Lyford*, 171 F.3d at 339. In other words, only after a plaintiff demonstrates the existence and violation of a clearly established constitutional or statutory right is the defendant required to show that he was performing a discretionary function and that a reasonable official would not have considered his actions to be unconstitutional at the time of the incident in question. *Id.* at 338.

 A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would

have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Foster v. City of Lake Jackson,* 28 F.3d 425, 429 (5th Cir.1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his actions [what he is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034; *Stefanoff v. Hays County,* 154 F.3d 523, 525 (5th Cir.1998); and *Pierce v. Smith,* 117 F.3d 866, 871 (5th Cir.1997).

■■■■ In *Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. 3034, the Supreme Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him. If public officials or officers of "reasonable competence could disagree [on whether an action is legal], immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Gibson v. Rich,* 44 F.3d 274, 277 (5th Cir.1995) (*citing Babb v. Dorman,* 33 F.3d 472, 477 (5th Cir.1994)). Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster v. City of Lake Jackson,* 28 F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034. For an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant

is doing violates federal law in the circumstances." *Pierce v. Smith,* 117 F.3d at 882; *Stefanoff v. Hays County,* 154 F.3d at 525.

## IV. *Analysis*

### A. Application of Qualified Immunity to Plaintiff's Claim of Unlawful Detention

■■■■ That a peace officer has a duty to detect and suppress crime, preserve the peace, protect the public safety, arrest persons who commit crimes, and investigate possible criminal activity is so well settled that the court will not even bother to reference a cite. A peace officer may lawfully detain a person for the purpose of temporarily investigating possible criminal activity, provided he has a reasonable suspicion based on objective facts that criminal activity may be underway or has occurred. *See Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Thomas was briefly detained by Murray; he was not under arrest in the traditional sense. Accordingly, the standard to be applied in addressing Thomas's unlawful detention claim is that of reasonable suspicion, which is a lesser standard than probable cause. A peace officer's right to make an investigatory stop necessarily carries with it the right to employ some degree of force or the threat to use force to effect the investigatory stop. *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Applying the doctrine of qualified immunity to Plaintiff's claim of unlawful detention, the court finds that Plaintiff has alleged a violation of a constitutional right and that the right to not be unlawfully detained was clearly established in June 1996. *See Brown,* 443 U.S. at 51–52, 99 S.Ct. 2637. The only remaining question is whether the conduct of Murray in detaining Plaintiff could be considered objectively reasonable.

■■■■ Murray, as stated earlier, was trying to determine what had earlier tran-

spired at the fruit stand. Frankly, Murray did not know what had occurred. Williams initially had indicated to Murray that he wanted to press charges. He only had Williams's version and believed that he should make further inquiry regarding the events after receiving Williams's statement and complaint about what had transpired. No competent summary judgment evidence has been presented to contradict these particular facts as set forth by Murray; thus, they are undisputed. As a law enforcement officer, Murray had legal authority to return to Thomas's place of business to make an inquiry of Thomas. Murray did what any reasonable law enforcement officer should have done; that is, he returned to the location to investigate and obtain Thomas's version of the incident. Given the information known to Murray, a reasonable police officer could have believed that he had lawful authority to detain Thomas briefly until he completed his investigation with respect to what had earlier occurred at the fruit stand between Thomas and Williams. Accordingly, Murray is entitled to qualified immunity on Plaintiff's claim of unlawful detention, and summary judgment is appropriate on this claim.

### B. Application of Qualified Immunity to Plaintiff's Claim of Excessive Force

▬ The court now applies the qualified immunity standard to the elements of a claim of excessive force. Plaintiff's claim for excessive force must be determined according to Fourth Amendment standards because "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and it's 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The issue of reasonableness centers on whether the officer's actions are "objectively rea-

sonable" in light of the facts and circumstances with which he is faced, without regard to the officer's underlying intent or motivation. *Id.* at 397, 109 S.Ct. 1865. Whether the use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. In applying *Graham*, the Fifth Circuit has used a three-part test for § 1983 excessive force claims, requiring a plaintiff to show (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable. *Knight v. Caldwell*, 970 F.2d 1430, 1432–33 (5th Cir.1992), *cert. denied*, 507 U.S. 926, 113 S.Ct. 1298, 122 L.Ed.2d 688 (1993); *see also Ikerd v. Blair*, 101 F.3d 430, 433–34 (5th Cir.1996); *Spann v. Rainey*, 987 F.2d 1110, 1115 (5th Cir.1993). Injury means damage or harm to the physical structure of the body, including diseases that naturally result from the harm. *Knight v. Caldwell*, 970 F.2d at 1433.

▬ Thomas has established that he suffered an injury for purposes of summary judgment. He has testified that he was pushed "violently" or "slammed" against the wall by Murray, and that his head struck a nail on the wall and that his elbow also struck the wall. Thomas frequently had "terrible" headaches for several months and suffered double vision after the incident. He also lost temporary use of his left arm following his encounter with Murray. The court finds this testimony alone is sufficient to meet the injury prong of the three-part test. Defendants' objections to Plaintiff's statements regarding what his doctor told him about his injuries are overruled as moot because the doctor's statements are not necessary to establish a constitutional injury. Thomas's testimony alone is sufficient to raise a genuine issue of material fact. Given the state of the law at the time of the incident in question, a reasonable jury could consider that

Thomas suffered an injury as a result of Murray's actions.

The next issue to be decided is whether the force was clearly excessive to the need to use force and whether the amount of force was objectively reasonable. With respect to the issue of force, the only point of material disagreement is whether Thomas ever removed, or attempted to remove, the gun from his back pants pocket. He says that he did not remove, or attempt to remove, the pistol from his hip pocket or brandish it at anyone. Murray disagrees with this statement. The court accepts Thomas's account as true for purposes of summary judgment.

Based on the undisputed facts as set forth in detail by the court, Murray's use of force was not clearly excessive to the need to effect a brief detention of Plaintiff and determine what had actually transpired, or objectively unreasonable under the circumstances. As previously stated, the right to make an arrest or investigatory stop necessarily carries with it the right use some degree of force, if necessary, to effect the investigatory stop. In this instance, it is undisputed that Thomas refused to surrender his pistol to Murray, a law enforcement officer conducting an investigation. Murray's statement that Thomas was talking loudly and appeared agitated has not been contradicted by Thomas. When Thomas refused to surrender the pistol, Murray used the force previously described to disarm him.

Plaintiff contends that no force was necessary because he never removed the pistol from his hip pocket and because Murray conceded that if he (Thomas) were not waving or brandishing the gun, he (Murray) had no legal basis to disarm Plaintiff. Plaintiff's argument is specious. A police officer should be able to conduct an investigation without any threats or potential threats to his safety or that of others.

Indeed, it would be fatuous to suggest that a police officer could not take action to "neutralize" any threats or potential threats to his safety or that of others during the course of a legitimate police inquiry or detention. *See Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Given the facts and circumstances of this case, a reasonable police officer could have believed that it was necessary to disarm Thomas for safety reasons while he conducted his investigation, *even though the pistol remained in Thomas's hip pocket at all times*. A gun in one's hip pocket certainly can pose a threat to a law enforcement officer's safety because the gun could be pulled out and used in a matter of seconds. A reasonable police officer certainly could have concluded that the use of force was necessary under the facts of this case as long as Thomas had a weapon in his immediate possession. Regardless of any subjective intent or motive on Murray's part, a reasonable officer could have believed that the force Murray used was necessary to effect the investigatory stop. Some officers could disagree regarding Murray's use of force; however, the true essence of qualified immunity is that it should be recognized if officers of reasonable competence could disagree on the action or conduct in question. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Moreover, the record necessarily establishes that once Murray took possession of Thomas's gun, he holstered his own gun and no further force or threat of force was used. The court finds that the force used by Murray was not clearly excessive to the need and that the amount of force used by Murray was objectively reasonable. Accordingly, there is no genuine issue of material fact, and Murray is entitled to judgment as a matter of law with respect to Plaintiff's claim of excessive force.[2]

---

**2.** Plaintiff cites Tex. Pen.Code Ann. §§ 46.02 and 46.15(b)(2) (Vernon 2000) for the proposition that a landowner or person in control of his premises has an absolute right to carry a firearm and can be "armed to the teeth" while on those premises. Plaintiff's Brief in Support of Response to Defendants' Motion for Summary Judgment at pp. 11–12. Thom-

## C. Plaintiff's Claim regarding Policy or Custom

Plaintiff contends that Sheriff Cotten, as the policymaker for Navarro County Sheriff's Department, has adopted and ratified Murray's conduct, which he (Plaintiff) believes to have been unconstitutional. Thomas contends that Sheriff Cotten, after Plaintiff filed his complaint, "just went through the motions of conducting an internal affairs investigation," and that "no attempt was made to determine what version of the facts was to be accepted by the [s]heriff." Plaintiff's Brief in Support of Response to Defendants' Motion for Summary Judgment at p. 19. Thomas further complains that the lack of disciplinary action against Murray establishes that Sheriff Cotten ratified Murray's allegedly unconstitutional conduct.[3]

 A governmental entity can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. *Board of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A governmental entity *cannot* be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Id. See also Baskin v. Parker,* 602 F.2d 1205, 1208 (5th Cir.1979). Official policy is defined as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [county] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of [county] officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [county] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the [county] or to an official to whom that body had delegated policy-making authority.

*Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984); *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984). A plaintiff must identify the policy, connect the policy to the governmental entity itself and show that his injury was incurred because of the application of that specific

---

as's reasoning is flawed. Nothing contained in § 46.02 or 46.15(b)(2) even intimates that such a person's right to carry a firearm is so broad and all encompassing that it can interfere with or impede a legitimate police inquiry.

Implicit also in Plaintiff's theory of the case is that Murray should have essentially disregarded anything Williams told him, because Williams had a criminal record. This position is puzzling. That a person has a criminal record does not preclude him from being a potential crime victim. The court, of course, is not saying that Thomas committed a crime. This court is saying that Murray was investigating to ascertain precisely what had occurred between Williams and Thomas and whether criminal charges were warranted against Thomas. Thomas's status as owner of property does not make him immune from legitimate police inquiry.

3. In addition to ratification, Plaintiff also alleged that Sheriff Cotten and Navarro County failed to establish procedures to prevent Mur-

ray's illegal acts and failed to provide Murray with any guidance on the proper use of force. Plaintiff's Original Petition (sic), ¶ 17. As Plaintiff only addresses the issue of ratification, he is no longer raising issues relating to training and hiring and has in effect abandoned these theories. In any event, a failure to train allegation can be the basis for liability under 42 U.S.C. § 1983 only if the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The record is absolutely devoid of any evidence of deliberate indifference on the part of Sheriff Cotten or Navarro County. There is likewise no evidence of deliberate indifference with respect to the supervision or hiring of Murray. Plaintiff raises no genuine issue of material fact, and the court finds that any claim of liability based on training, supervision or hiring must be dismissed.

policy. *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). A plaintiff must establish that the governmental entity through its deliberate conduct was the moving force behind the injury or harm suffered and must establish a direct causal link between the governmental entity's action and the deprivation of a federally protected right. *Bryan County v. Brown,* 520 U.S. at 403–04, 117 S.Ct. 1382.

Liability must rest on official policy, meaning the governmental entity's policy, and not the policy of an individual official. *Bennett,* 728 F.2d at 769. The official complained of must possess

> [f]inal authority to establish [county] policy with respect to the action ordered.... The official must also be responsible for establishing final government policy respecting such activity before the [county] can be held liable.... [W]hether an official had final policymaking authority is a question of state law.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–482, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). An employee, agency, or board of a governmental entity is not a policymaker unless the governmental entity, through its lawmakers, has delegated exclusive policymaking authority to that employee agency or board and *cannot* review the action or decision of the employee, agency or board. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Worsham v. City of Pasadena,* 881 F.2d 1336, 1340–41 (5th Cir.1989).

The court first looks to state law in order to determine if Sheriff Cotten possesses final decision-making authority with respect to law enforcement decisions. "[I]t has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement." *Colle v. Brazos County Texas,* 981 F.2d 237, 244 (5th Cir.1993)(*quoting Turner v. Upton County,* 915 F.2d 133, 136 (5th Cir.1990)); *see also Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980). By virtue of being elected to office, Sheriff Cotten has the exclusive policymaking authority in the area of law enforcement, and no Navarro County body or official can review the action or decisions of Sheriff Cotten in the area of law enforcement. The court, therefore, concludes that Sheriff Cotten is the final policymaker in the area of law enforcement for Navarro County.

Plaintiff's theory of ratification is simply too slender of a reed to raise a genuine issue of material fact regarding county liability. First, Plaintiff's contentions are incorrect. The record evidence establishes that Plaintiff made a complaint to Sheriff Cotten regarding the incident in question, that Sheriff Cotten assigned the complaint to the Sheriff's Office Internal Affairs Division (IAD), that the IAD investigated the complaint with the assistance of Texas Ranger Otto Hanak, that Plaintiff and his wife, as well as other witnesses, were interviewed, and that Sheriff Cotten submitted the findings of IAD and Ranger Hanak to Navarro County District Attorney Pat Bachelor for a review. The Sheriff's Office IAD concluded that no violations of department policy occurred, and the district attorney concluded that no criminal violation occurred. Contrary to Plaintiff's conclusory assertion, the record necessarily establishes that Sheriff Cotten did not merely "go through the motions" of conducting an investigation. Plaintiff is displeased with the results, but displeasure does not establish a constitutional violation.

Second, the evidence in the record conclusively establishes that neither Sheriff Cotten not Navarro County was deliberately indifferent to the type of conduct complained of by Thomas, or that Sheriff Cotten or Navarro County encouraged or approved the use of excessive force by its deputy sheriffs. Murray himself was suspended for three days for use of excessive force in May 1989. In light of Murray's

discipline, he knew that discipline for use of excessive force was real, rather than a hollow gesture. That an incident involving the use of force occurs in no way suggests that a governmental entity condones or approves the use of unconstitutional conduct. Sheriff Cotten had a procedure in place to address complaints that citizens made against law enforcement personnel of the Navarro County Sheriff's Office. There is simply no evidence that the conduct of Sheriff Cotten or Navarro County was deliberately indifferent to the use of force by its deputies against citizens with whom the deputies came into contact. Since Plaintiff has failed to establish any deliberate indifference on the part of Sheriff Cotten or Navarro County, a policy or custom cannot be the cause of or the moving force behind a constitutional injury to Plaintiff. Accordingly, there is no genuine issue of material fact regarding Plaintiff's policy or custom claims, and Navarro County is entitled to judgment as a matter of law.[4]

### IV. *Conclusion*

For the reasons stated herein, there are no genuine issues of material facts regarding Plaintiff's claims against Defendant Ricky Murray in his individual capacity and against Navarro County. The motions for summary judgment of Defendants Navarro County and Ricky Murray are hereby **granted,** and this action is hereby **dismissed** with prejudice against Defendants Navarro County and Ricky Murray. Judgment will issue by separate order.

---

**4.** Plaintiff's reliance on *Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987), is misplaced. The facts in *Grandstaff* are not even marginally similar to the facts of this case, and thus *Grandstaff* has no applicability to this case. *Grandstaff* has not enjoyed significant application in this circuit. *See Snyder v. Trepagnier,* 142 F.3d 791, 797 (5th Cir.1998), *cert. dismissed,* 526 U.S. 1083, 119 S.Ct. 1493, 143 L.Ed.2d 575 (1999). Moreover, *Grandstaff* must be limited to its "peculiar" and "extraordinary" facts. *See Coon v. Ledbetter,* 780 F.2d 1158, 1161 (5th Cir.1986).